We'll go back to the first case, Bauer v. Periodontal Health. Mr. Bauer? Yes, good morning, Your Honor. I apologize for my technical inefficiencies. It's all right. You're here now. Very well. If it pleases the court and counsel, I'm William Bauer, Woods Oviatt-Gilman, LLP, on behalf of La'Kerri Bauer, the plaintiff appellate in this case. Ms. Bauer appeals from an order, an opinion, from the Honorable William K. Sessions III, filed on May 6, 2020, granting summary judgment in favor of the defendant appellees and dismissing Ms. Bauer's complaint as untimely or insufficient to proceed to a jury on her violations of Title VII of the Civil Rights Law and New York State Executive Law and also her claims that Judge Session ruled were not supported for her claim violations of the Fair Labor Standards Act and the New York Labor Law. Ms. Bauer alleges that periodontal health specialist, PHS, as it's referred to, and the individual defendants violated her Title VII by discriminating against her on the basis of a race during her 17-year... I think we know what's involved, but you have to tell us why Judge Sessions got it wrong. Your Honor, I respectfully that Judge Sessions... District Court weighed the evidence as opposed to identifying issues of fact, thereby depriving her of the opportunity to present competing facts and credibility to a trier of fact. From the record, it reveals that Ms. Bauer was one of few African-American employees at PHS. What is the discrimination complained of? Is it constructive discharge? Is it hostile environment, both, something else? Hostile environment and retaliation that ultimately resulted in Ms. Bauer resigning to protect her own health and emotional well-being. Are you also asserting a discharge claim or not? That she was constructively discharged. We have to prove that element, Your Honor, as part of the complaint. Everything was sort of blended together, and I'm just trying to sort it out. You do have a constructive discharge claim. You do have a hostile environment claim and a retaliation claim. Yes, Your Honor. On the constructive discharge, there is undisputed evidence that this was a family, she was willing to stay on. There were a lot of inappropriate comments for sure. But how do you deal with that? I mean, in other words, for constructive discharge, you have to prove that no reasonable person could have tolerated the conditions, but she did tolerate. And even after she gave notice, she said, I'm willing to stay longer if you need me. Well, her notice said that she would give him the requisite two weeks in order for them to do a professional conversion of her responsibilities to someone else. Didn't she also say she would stay longer if they needed her? I think that was part of Ms. Byers' professionalism, Your Honor. I understand that, but so don't those facts cut against the argument that no reasonable person could have tolerated this? Well, Your Honor, I think from our perspective, she was trying to do what was right, but she had made the final conclusion that she could no longer tolerate or continue to operate in the system that allowed for this behavior from Dr. Lonegooth to continue. And that culminated in literally a physical confrontation that occurred in October. And we have in the record conflicting... Is that when she was led by the elbow to a meeting? Well, Your Honor, that's the argument that she was led by the elbow. That's one of those factors that... What's your version of the physical confrontation? She was completely and unequivocally innocent of any of the allegations that were being made with respect to the billing error. And Dr. Lonegooth physically confronted her in the presence of the business manager and literally shook her and blaming her for an error that had been committed. No, no. Okay. I'm trying to figure out which part of this is physical. And you're saying the physical part was that she physically shook her? Correct. And confronted her. And from that... I mean, coupled with what had occurred over the years. I mean, in any modern workplace and under any reasonable standard, a professional asking one of her or two of her employees to wear a necklace that says the word bitch or slave on it can't possibly be tolerated in any workplace. Am I correct that there's a statute of limitations issue with respect to these Title VII allegations? You are, Your Honor. Judge Sessions ruled that the claim under Title VII was untimely in that it was the time for the 300 days ran from the date of resignation rather than the date that she actually left employment. I don't see an issue made of that in your brief. It's just a throwaway phrase. I don't think you challenge that. I can't find in good faith, Your Honor, to challenge the judge's determination with respect to the statute. But I do point that the New York State... So you're proceeding under New York State rather than under the federal? New York State has a six-year statute of limitations, which... So you're proceeding under that and not under the federal because of statute of limitations? Right. And I argue from Title VII because the standards are the same, Your Honor. And the executive law in New York applies the same criteria. What is the adverse employment action under the New York State human rights law? Her constructive discharge, her ultimately to a point where she could no longer tolerate and was forced to leave. I reserve some time for rebuttal, but I'm happy to address. There's one other statute of limitations issue, and that relates to the FLSA claims. Those both under the federal law and New York State law would be two years from the date of the filing of the complaint and three years if it's willful. Judge Sessions miscalculated the two-year period. The claims are timely from both the two-year statute and a three-year statute if the issue of willfulness was permitted to be determined by the trier of fact. You're saying it's timely even under the two-year statute? Yes, Your Honor. Okay. You have some rebuttal time. We'll hear from Mr. Diller. Thank you. You're on mute, Mr. Diller. Unmute. At least I am. I am. At least I'm on video. We'll have to do remedial lessons for both Mr. Bauer and myself. May it please the court. Include me. Okay. I'm not sure I can describe what this case is about any better than Judge Sessions did in his thoughtful and probing opinion. I want to just start with the questions. Before, you know, on the last point that Mr. Bauer was making, it does look like Judge Sessions got the statute of limitations wrong on the FLSA claim. He added incorrectly. And we've acknowledged that in our brief. We believe it's a distinction without a difference because there's absolutely no showing of integrated single employer or joint employment. And even if a plaintiff had pleaded or articulated a claim throughout that period, which is not at all clear from the record because Mr. Bauer's client never identified. You're saying you went on the merits irrespective of the statute of limitations. Exactly. Exactly. And I'm going to devote some of my attention to the title seven issue because most of this argument has been about that. But if the court wants me to go back to the merits on the. I have a kind of an over maybe it's an overriding question, but it's very unusual to me. I don't know everything. I don't know. We've been a little part of everything. But the facts of this case strike me as unusual in that there was the use of language and pictures and such, which one would think is is it barely exists today? I mean, it's really quite extreme. At the same time, the employee had seemed to have a very close relationship with with with with the person who was who was issuing these statements. And I guess my my question become because it's unusual. My question becomes not whether it doesn't make it isn't possible for both these kind of awful pictures and statements to be made and yet for it not to give rise to a cause of action. My question is why on summary judgment, why isn't that a question? I think hostile work environment under the New York State statute, if there is such a thing. Why is why? Why isn't I understand? I understand. So so first of all, we're going to take title seven out of the picture because everybody's agreeing that that claim was not timely. The New York State statute of limitations, unlike what Mr. Bauer said, is not a six year statute of limitations. It's a three year statute of limitations. And the only thing which occurred during that three year period of time was an embellishment of a photograph of of both of Dr. One of whom was not. But both she she put glasses on one here on the other. But it was an embellishment of both. So you're saying that much of much of what disturbs me is outside the statute of limitations. Everything that I believe that disturbs you is outside the statute of limitations, including what Mr. Bauer described with respect to the necklaces. And Mr. Bauer plaintiff says we have to look at the totality of the circumstances. I agree totally. You have to see these issues in context. This was this judge sessions in his probing decision found a familiar and family like situation. And Bayer felt free to dress up like Dr. Low and there's a photograph in the record where she's wearing her scrubs and things of the sort. Bayer felt free to to understand, please. I think I get that. It's just that as you describe it. And despite your your appreciation of Judge Sessions opinion is probing and deep. The question is whether you're not describing a question of fact that is one would think is for the for the jury. No, there's no there are no questions of fact, which is also one of the unusual circumstances of this case. It's not a question of looking at whether the alleged discrimination and not all of this. These allegations have been admitted to you, but whether the alleged discrimination was timely, was severe or pervasive and intimidating and offensive. We've got her own words. Nobody made her publish what she said about the environment five about five days before she resigned. And I can talk about the allegations of physical. There was nothing physical. She admits that there's nothing physical. She does not rely on the record in her briefs. She relies on her after the fact declaration, which is inconsistent with the record. You say that she admits that there's nothing physical. I just heard your adversary talk about her boss shaking her. Yeah, I that's I don't I don't see that in the record at all. As Judge Sessions found, he looked at it and he said, no, the evidence is that she escorted her out by the elbow where there was a billing problem. In fact, Ms. Byer admits that there was a billing problem. The dentist confronted her about the billing problem. She and they started to have a discussion about it. And the dentist escorted her by the elbow back to a private area so that that discussion would not be in front of patients. If I can go back also to so I don't just like there's the statute of limitations. It's not six years that also while that what I was going to say is that five days before that, Byer published publicized. Nobody made her publicize these things. What a great team we are there. The same year, she said, what a great boss she has. This was was whether in the context of looking at it through our eyes right now, we weren't there. It was back and forth. Byer felt free to publish pictures of herself from the workplace. And by the way, much of what's alleged in the complaint did not even occur in the workplace. So, you know, when we talk about cartoons, things of the sort, the necklaces, which are not timely considered, even under the state statute of limitations. These were gag necklaces that were given to Dr. Lunguth and her husband. They had nothing racist in them. They're being used to convey a racist opinion. Is that incident within or beyond the statute of limitations? It's beyond the state statute of limitations. Admittedly, admittedly, admittedly. And Byer testified that she knew that these were gag gifts. So you have to look at the context. And you're right, Judge Sack, this is a very unusual environment. So unusual that Dr. Lunguth, right before she terminated her employment, when Byer had to go for an endoscopy, who did she ask to accompany her to be the driver? Dr. Lunguth. I said, look, the only at the end of the day, the only thing I have to wrestle with is, is whether you just supported the the granting of the motion for summary judgment or made an excellent summation to the jury. And that's kind of my question. And there's no there's no material question of fact. Let me go back. Let me take you back to the the wage and hour claim and the short employer. There does seem to be evidence in the record that they were joint employers. A letter, partners expressing their appreciation to her for her work at both PHS and at Dental Divas. You know, she seemed to do some work for PHS patients and then did some other work for Dental Divas. Why isn't there an issue of fact as to whether they were joint employers? Because the the standard. So the CFR provides that each employer may disregard all work performed by the employer for the other employer. If they're acting independently here, they were two separate LLCs with separate members. They had separate books. They had separate records. They had separate billing. They had separate telephones. They had a separate credit card machine. This document that you're referring to was not PHS. PHS did not exercise any control over her work at Dental Divas and Dental Divas did not exercise any control over her work at PHS. She was paid separately. She recorded her hours in different ways, different time systems. She did work for both. But you're saying it was completely separate work. Completely separate. And it's completely separate businesses. And the allegation contained in plaintiff's reply brief that she alleges that she did the same work for both is not supported by the record either. That's a conclusion. She took CAT scans for any referring dentist, including referring dentists that were not PHS dentists at Dental Divas. Dental Divas was a company that was formed by two people. PHS had three members and those three members never, PHS never had anything to do with Dental Divas. And so she took the CAT scans. The CAT scans were enclosed in a separately numbered suite. I could go through those allegations. And again, in terms of material question of fact, none of that information is disputed. All right. Thank you. Mr. Bauer, your rebuttal. Thank you, Judge. To respond with respect to the Dental Divas issue and the joint employment, I believe that's another set of circumstances where Judge Sessions weighed the evidence as opposed to identifying the issues. It's clear that there that she literally did the same type of CAT scans for patients of Dental Divas and patients of PHS. The the access to the to the machine, the imaging machine was, yes, there was a front door for Dental Divas. There was a back door from PHS that went immediately into the CAT scan where PHS patients went and where where Dental Divas patients went. Dr. Lonegooth and Dr. Lester were the were the owners of Dental Divas. They were also two of the owners of of PHS. Her work was literally identical. And the work was this was a contrived scheme by the accountant to avoid overtime pay. She was only only allowed to report 40 hours for PHS. And the balance of her time was then allocated over to counsel. You say her work was identical. But my from the record, I gather that there was a very expensive imaging machine and she was the only one who operated it. And that's basically all that was done at at Dental Divas. And she did the same type of CAT scans and imaging for PHS. In the PHS offices? Using the using the Dental Divas CAT scan. That's where the that's where the issues come up. Any but you would agree that that any dentist could send somebody to Dental Divas to have a CAT scan done. That's why. Right. So why couldn't. Why does it matter that that that the defendant was doing it as well? PHS in that they were they were allocating her time between PHS and Dental Divas. Yet she was doing this. The same work just simply. Well, I guess I guess the point it sounds. I mean, I guess a question is whether if PHS had a patient and sent it to Dental Divas for a CAT scan, was a payment made to Dental Divas for that CAT scan? No, the CAT scans that I don't know about the allocation of the economics judge. I do know that I be routinely in her work for PHS did CAT scans for PHS employee patients. And then using using the Dental Divas equipment. That's correct. That's in the record. Yes, your honor. And it's an adjoining door. The PHS. I know that part. I know. I'm just trying to figure out whether whether Dental Divas and doing the CAT scan work for the dentist at large. And this defendant, whether it was treating them all the same or was treating this dentist very differently because it was doing it for nothing. Answer that, your honor, if you want to hear from me. That's not the way it works up here. Your honor, I think that there were clearly clear questions of the work that she was doing, being allocated. And and that it was it was in an effort to avoid having to pay her overtime for the work that she was doing. And I believe there are questions of fact on that. Obviously, we'll have to take a close look at the record. Thank you both. The court will reserve decision. Thank you.